IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RICHARD GARY MCGUIRE,

    Plaintiff,

vs.                                                                   Case No. 08-1072-JTM

AMERICAN FAMILY MUTUAL INSURANCE CO.,
AMERICAN FAMILY LIFE INSURANCE CO.,
AND
AMERICAN FAMILY STANDARD INSURANCE
    COMPANY OF WISCONSIN,

    Defendants.


MEMORANDUM AND ORDER

Plaintiff Richard McGuire, a former American Family Insurance agent, has brought the present action claiming that his termination violated American Family's contractual obligations. The defendant American Family Insurance companies have moved for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

McGuire is a resident of Sedgwick County, Kansas. Defendants (collectively "American Family") are related Wisconsin corporations authorized to engage in the insurance business in Kansas.

In March 1989, McGuire and American Family entered into a written agreement authorizing McGuire to serve as an American Family insurance agent. At or around the same time, McGuire took and passed an insurance licensing examination administered by the Kansas Insurance Commissioner, as required by law.

In January of 1993, McGuire and American Family entered into a second written agreement (hereinafter "the Agent Agreement") which superceded and replaced the prior agreement. McGuire read and understood the Agent Agreement before he signed it. The Agent Agreement remained in effect throughout the period in which the events in issue took place.

Section 6 of the Agent Agreement provides in part that:

It is mutually agreed that . . .

g. This agreement shall continue from its effective date until termination as herein provided.

h. 1) Except as provided in paragraph 2) below, this agreement may be terminated by either party with or without cause by giving written notice to the other and shall be deemed terminated as of the date specified in that notice. If both parties give notice, the earlier termination date shall control. This agreement shall automatically terminate upon your death or upon the date your license to act as an agent for (American Family) is suspended, revoked or canceled.

2) After two years from effective date of this agreement or after the termination date of your Agent Advance Compensation Plan, whichever is later, (American Family) will give you notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. (American Family) will not terminate the agreement for those reasons for a period of six months after that written notice. *In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4i or any other dishonest, disloyal or unlawful conduct*; nor shall any notice be required in the event that (American Family) terminates substantially all agreements of this type throughout (American Family) or in a particular state or area.

(Exh. 61, at 4-5) (emphasis added).

Section 4i of the Agent Agreement provides as follows:

You agree . . .

I. To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of (American Family) to best of your ability, to refrain from practices competitive with or prejudicial to (American Family) and to abide by and comply with all applicable insurance laws and regulations.

(Exh. 61, at 3).

Section 7 of the Agent Agreement provides in part that:

Binding Provisions  (c.) Rates, rules, regulations and all provisions contained in the Company's Agent's Manuals and all changes to them shall be binding upon you . . .

(Exh. 61, at 8).

Section 7 further provides that:

> Jurisdiction      (d.) This agreement shall be deemed to have been made within the State of Wisconsin and shall be interpreted and construed in accordance with the laws of the State of Wisconsin.

(Exh. 61, at 8).

McGuire completed a training course regarding the basics of Kansas insurance law prior to taking the agent's examination in 1989. He also completed dozens of training courses offered by American Family regarding a variety of topics over the course of the years thereafter, as he developed a successful American Family Insurance agency in Mulvane, Kansas. McGuire was initially licensed to sell property and casualty, health, life and crop insurance. In November, 2005, he became licensed to sell variable annuity contracts and was in the process of completing the Series 6 and 63 licensing process required in order to sell securities pursuant to federal securities law.

It is uncontroverted that the practice of "rebating" in the sale of insurance in Kansas has been prohibited for decades. *See, e.g.*, K.S.A. 40-2404(8).[1] The Kansas Insurance Commissioner is empowered to impose a monetary penalty and suspend, revoke or refuse to renew the license of insurance agents who engage in the practice. K.S.A. 40-2407 and K.S.A. 2008 Supp. 40-4909.

It is uncontroverted that, at all material times, American Family has provided and provides manuals and other written resource materials to all of its agents, including McGuire. One of the publications American Family distributed and distributes to all of its agents, including McGuire, is the Life Compliance Manual. McGuire contests the last point, stressing in his Response that he never saw a copy of the Life Compliance Manual until the present litigation. It is uncontroverted, however, that the Manual was included by American Family in an online format, beginning in May of 2002, and McGuire acknowledged in his deposition that he had access to the online materials.

---

[1] The statute lists a variety of prohibited activities that are considered unfair or deceptive trade practices in the marketing of insurance products, regardless of type. *See, e.g.*, K.S.A. 40-2403 and 40-2404. It overlaps at least two other statutes which prohibit rebating in the sale of certain specific types of insurance. *See* K.S.A. 40-966 (rebating prohibited in the sale of fire and casualty insurance); K.S.A. 40-3513 (rebating prohibited in the sale of mortgage guaranty insurance).

The version of the American Family Life Compliance Manual in effect through May 2002 stated as follows:

**Rebating**

**AN AGENT MAY NOT GIVE A POLICYOWNER OR PROSPECTIVE CLIENT ANYTHING OF SIGNIFICANT VALUE (OVER $10) AS AN INDUCEMENT TO PURCHASE OR MAINTAIN INSURANCE WITH AMERICAN FAMILY**

| | |
|---|---|
| **GENERAL RULES** | An agent may not pay all or any part of an initial or renewal premium for a policyowner or prospective client. |
| | An agent may give a policyowner or prospective client any item listed in the Sales Aid section of the Advertising Manual . . . |
| | An agent may not give a policyowner or prospective client any item worth over $10 |
| | Payments of cash in <u>any</u> amount to a policyowner or prospective client is prohibited. |

(Wiersma Affidavit, p. 2, ¶ 5 and Exhibit A) (emphasis in original)

When the Manual was updated in May 2002, certain "frequently asked questions" were added to the discussion regarding rebating:

**Rebating**

You may not give a policyowner or prospective client anything of significant value (over $10) as an inducement to purchase or maintain Life Insurance with American Family . . .

**General Rules**

• You may not pay or loan all or any part of an initial or renewal premium for a policyowner or prospective client....

. . . .

**FAQ (Frequently Asked Questions)**

**Question**

Can I pay a client's premium if they are a little short for a given month, and I know they will be able to pay me back in a short period of time?

**Answer**

No. This is rebating, and is taken very seriously by the Home Office and State Insurance Departments.

**Question**

Can I advance a premium when the Home Office has lost the client's check?

**Answer**

No. Advancing premiums on behalf of a client is rebating . . . .

(Wiersma Affidavit, p. 2, ¶ 7 and Exhibit B). This discussion appeared in the Life Compliance Manual, with minor revisions, for the remainder of McGuire's tenure with American Family.

On June 10, 2004, Ranger Duran, the American Family vice president for the four-state region including Kansas, sent an e-mail to all agents for whom he was responsible, including McGuire. The e-mail reminded agents of the need to refrain from certain types of "unacceptable" conduct—including rebating—and that agents engaging in such conduct were subject to discipline up to and including termination.

It is uncontroverted that McGuire sold a policy of life insurance to Matthew Carney on behalf of defendant American Family Life Insurance Company in November 2000 and that he paid a portion of the premiums due for the insurance for five years.

McGuire knew that rebating was illegal. He contends that his payment of the premiums was not rebating because the underwriter who first evaluated Carney's application erred in her classification of the risk, and because McGuire allegedly did not make the payments in issue "as an inducement" to persuade Carney to purchase and retain the insurance.

On or about November 14, 2000, McGuire prepared and submitted an application to purchase $250,000.00 in level term life insurance coverage to defendant American Family Life Insurance Company on Mr. Carney's behalf. McGuire prepared and Carney signed a document entitled "A Life Insurance Policy Illustration" which accompanied the application. The illustration was based on McGuire's assumption that the coverage would cost $297.50 per year.

In 2000, defendant American Family Life Insurance Company classified life insurance risks within one of five categories. There were two "standard" rate structures: "Smoker" and "Nonsmoker." Three discounted rate structures were also available: "Preferred," "Select," and "Super Select." Premiums based on Smoker rates were the most expensive, followed in descending order by Nonsmoker, Preferred, Select and Super Select. Super Select rates were only available in relation to policies providing $500,000.00 or more in coverage.

The illustration McGuire presented to Mr. Carney and ultimately submitted with Mr. Carney's application assumed that Mr. Carney would qualify for Select rates, the lowest premium rate potentially available to him. Mr. Carney's check for $297.50 was submitted with the application. As noted, this sum represented what the annual premium would have been had Mr. Carney qualified for Select rates.

American Family underwriter Lori Oakley reviewed the application, including Carney's medical history information, and concluded that he was not eligible for Select rates. The precise reason for her decision is unclear. According to her review of her notes, Oakley has indicated that her decision was based on American Family's underwriting criteria, and specifically on the fact that Mr. Carney reported having lost a sibling to cancer when the sibling was 10.

In his Response, McGuire states that he was never told of the cancer risk. He states that he was told by an underwriter, whom "he now assumes was Oakley," that Carney did not qualify for Select rates because of his cholesterol. Further, it appears that Carney subsequently obtained another cholesterol test and forwarded the results to American Family.

In contrast, there is evidence that Oakly wrote into American Family's computer system – to which McGuire had access –

> BECAUSE OF MATTHEW'S FAMILY HISTORY OF DEATH BEFORE AGE 60 DUE TO CANCER IN A SIBLING SELECT AND PREFERRED RATES ARE NOT AVAILABLE.

7

In addition, American Family underwriting standards provide that Select status is not available if there has been the "death of a parent or sibling prior to age 60 due to cancer, heart disease or diabetes."

Oakley continued to evaluate the application, as well as the results of blood and urine testing submitted with it. She was concerned for a time by an elevated protein level in Carney's initial urine specimen. The problem did not resurface when the test was repeated. Oakley ultimately approved the application and "signed off" on the policy, at which point the policy was issued by defendant American Family Life Insurance Company—at the Nonsmoker rate of $472.50 per year.

American Family agents may request a review of underwriting decisions in relation to applications they submit. Oakley has no recollection of being contacted by McGuire or Carney regarding her underwriting decision, and American Family has no record of such contact or of any request for review of the underwriting decision.

McGuire has no record of any effort he made to obtain review of the underwriting decision. McGuire believes he sent American Family an e-mail in the immediate wake of the decision but does not have a copy, and acknowledges that he did not communicate with any of the defendants in writing regarding the Carney policy at any point thereafter.

Oakley erred in her review of Carney's application, believing that his health history precluded both the Select and the Preferred rate. In fact, Carney was entitled to the lower Preferred rate, if not the lower Select rate. According to the criteria in effect for life insurance sold in Kansas from October 2000 through June 2003, in order to qualify for Preferred rates an applicant's family history could include "no more than one death of a parent or sibling prior to age 60 due to cancer, heart disease or diabetes." It is uncontroverted that Carney was never eligible for the Select rate that McGuire quoted to him of $297.50 per year.

Connie Kunick is a Life Services Specialist who has been employed by American Family at its home offices in Madison, Wisconsin for 30 years. As part of her duties, Kunick fields inquiries and complaints from insureds and others that come in by telephone.

On December 12, 2005, Kunick took a call from Carney. He reported that the bill he received for his life insurance reflected a premium of $472.50 per year, instead of the $297.50 per year he believed to be the correct amount. He said that he had received similar "erroneous" billings in prior years since he bought the policy five years earlier. Carney thought the "error" was attributable to an elevated result on a cholesterol test taken when he bought the policy, and that the error was going to be corrected.

Kunick reviewed the policy and "saw that there was a discrepancy in the premium class code on the policy. His policy was issued Nonsmoker, not Select as it had been illustrated to the customer." (Kunick Dep. at 19).

After telling Mr. Carney that she would look into the situation and report back to him, Kunick tried to speak to Oakley, but was unable to reach her. She then discussed the situation with another American Family underwriter, Shirley Raisbeck. Her purpose in doing so was to:

> ... check with the underwriter regarding that premium class to see if there could have been an error on that, and she confirmed that there was not. And then (she and Ms. Raisbeck) discussed that the best rate he could have received would have been Preferred. He did not qualify for Select because of – because of cholesterol but because of the history of cancer in his family.

*Id.*

Kunick called Carney back the same day to discuss the matter further. Carney reiterated that he thought the billing was in error due to a cholesterol test, which he thought had been corrected. During this conversation, Carney reported that he "never paid more than $297.50 in a premium" and that "he (sic) agent advised him to send his payment to him and he would send it (to American Family) with a note." (Kunick Dep. at 24-25).

Kunick discussed the situation with Carney again on December 19, 2005. She explained that with his family history of cancer, he did not qualify for the Select rates that had been illustrated to him. She told him that he did qualify for Preferred rates, but that the premium would be $352.50 per

year if he wished to keep the policy in force. Carney ultimately agreed to maintain the policy in force at this rate. (Kunick Dep., pp. 36-37 and Exhibits 16, 21).

At the time the problem associated with the Carney policy surfaced in December of 2005, Ms. Raisbeck—the underwriter with whom Ms. Kunick consulted—thought the underwriting criteria which made it possible for Carney to obtain insurance at the Preferred rates had changed only after the policy was issued and that American Family was doing Mr. Carney a favor when it re-rated the policy effective as of the date of issuance. In fact, Carney would have qualified for Preferred—but not Select—at the time the policy was issued.

The recalculation of premiums based on the Preferred rate of $352.50 per year was approved, effective from the inception date of the policy.

After hearing from Carney, Kunick spoke to her supervisor. Among other things, she told her supervisor that it appeared the American Family agent who sold the policy in issue had paid a portion of the insured's premiums—the difference between $297.50 and $472.50 per year—on multiple occasions. Kunick was instructed to convey the information to American Family field management, with a request to investigate the situation to see what happened "as far as the agent was concerned." She was also told to advise the management of defendant American Family Life Insurance Company and its broker-dealer arm, American Family Securities, LLC.

On December 22, 2005, Kunick sent a report regarding Carney's call and her findings to Rachelle Burton, American Family's State Sales Director for Kansas, via e-mail. She sent a copy of her report to Clint Poeschl, American Family District Sales Manager for the district within which McGuire worked.

The e-mail asked Burton to "investigate this situation as soon as possible and advise us what you find regarding the payment of premium on his policy." (Kunick Dep. at 32-33).

Burton instructed Poeschl to interview McGuire and Carney regarding the situation. Poeschl did so, and also spoke to American Family in-house counsel Yvonne Johnson regarding McGuire's

payment of insurance premiums on Carney's behalf and whether this constituted "rebating." (Poeschl Dep. at 67-70, 83-84, 86).

Johnson advised that McGuire's payment of premiums on behalf of the insured constituted a form of rebating under Kansas law and was prohibited.

Poeschl met with McGuire on December 27, 2005. Poeschl told Burton:

> After reading him the e-mail sent to me from Connie Kunick ... I asked him if this was true. He proceeded to tell me ... that yes he had paid a portion of the life premium for insured Matthew Carney.... He said he did so because he had originally quoted Matthew Select Rates. It was later discovered that he didn't qualify for Select Rates. The policy was issued at Standard Non-Smoker Rates. (McGuire) did not notify Matthew that his premium would be higher. Instead, he called Matthew to let him know his Life Policy had issued (never telling him that it was rated up). Agent Gary McGuire felt compelled to pay the additional premium because as he stated, "money was real tight for Matthew and his family and he had a set a (sic) new born twins at home." Agent Gary McGuire stated, " (sic) to us that he knew his family needed the coverage and that it was something he wanted to do to help them out.

(Poeschl Dep. at 42).

Poeschl submitted a report to Burton, who read the report and reported the matter to her supervisor, American Family Regional Vice President Michael R. (Ranger) Duran, to discuss the matter. She believes she forwarded a copy of Poeschl's report to Duran although she is not certain. No similar e-mail has been located.

In January 2006, Duran was responsible for the supervision of 1,200-plus American Family agents in his region, and relied on his subordinates to carry out any necessary investigation of possible agent misconduct. Based on the information provided to him by Burton, Duran made the decision to terminate the Agent Agreement:

> Well, I relied on my subordinates to provide the information in an investigation like this, and I believe (Burton) would have provided to me the fact that - - that there was payments made on behalf of our client by Gary McGuire and that is rebating. Based on that information I decided to terminate Gary McGuire.

(Duran Dep. at 20-21).

11

Burton and Poeschl met with McGuire on January 3, 2006, to advise him that American Family had decided to terminate the Agent Agreement. Written notice documenting the decision was provided in the form of a letter to McGuire the same day.

Section 6i of the Agent Agreement provides that:

> I. In the event the Company terminates this agreement, you may request a review in accordance with the Termination Review Procedure then in effect. (American Family) may amend the Procedure from time to time.

(Exh. 61, at 5). McGuire was reminded of the Termination Review Procedure in his meeting with Burton and Poeschl.

McGuire never formally sought review of the decision to terminate the Agent Agreement. He does state that he tried to telephone Duran a couple of times, but was unable to reach him.

American Family computed and has been paying McGuire the termination benefits contemplated by the Agent Agreement at monthly intervals ever since.

The parties agree that Wisconsin substantive law applies to the present action, but that Kansas insurance law governs whether the payment of the premiums would be considered illegal rebating. With respect to McGuire's breach of contract claim, American Family argues that it was entitled to terminate his employment under Section 4(I) the agency contract, which provided that McGuire agreed to "abide by and comply with all applicable insurance laws and regulations." American Family argues that termination was permitted because McGuire's payments on behalf of Carney violated Kansas laws against insurance rebating.

K.S.A. 40-2403 provides that:

> No person shall engage in this state in any trade practice which is defined in this act as, or determined pursuant to K.S.A. 40-2406 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

K.S.A. 40-2404 provides, in pertinent part, as follows:

**Unfair methods of competition or unfair and deceptive acts or practices; disclosure of nonpublic personal information; rules and regulations.**

> The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:
>
> . . .
>
> > (8) Rebates.
> >
> > > (a) Except as otherwise expressly provided by law, knowingly permitting, offering to make or making any contract of life insurance, life annuity or accident and health insurance, or agreement as to such contract other than as plainly expressed in the insurance contract issued thereon; paying, allowing, giving or offering to pay, allow or give, directly or indirectly, as inducement to such insurance, or annuity, any rebate of premiums payable on the contract, any special favor or advantage in the dividends or other benefits thereon, or any valuable consideration or inducement whatever not specified in the contract; or giving, selling, purchasing or offering to give, sell or purchase as inducement to such insurance contract or annuity or in connection therewith, any stocks, bonds or other securities of any insurance company or other corporation, association or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the contract.

The plaintiff argues that his payment of Carney's premiums did not violate the anti-rebating statute, based on Carney's subsequent avowal that he would have purchased the policy anyway, regardless of price or the existence of any discount. McGuire accordingly argues that the premium payments were not any "inducement" to purchase the policy within the meaning of K.S.A. 40-2048. Essentially, he argues, there is no violation of the statute unless the customer would have not entered into the policy "but for" the agent's rebate payments. (Dkt. 72, at 35).

The court finds plaintiff's construction of the statute to be erroneous, and contrary to the clear intent of the broad, anti-discriminatory language of the policy. Kan. Att'y Gen. Op. No. 92-150, 1992 WL 613513, at *1 ("the statutes prohibiting rebates . . . are intended to protect against unfair discrimination"). A substantial reduction in the price actually paid by a consumer is certainly an inducement to further economic transactions. The statute is designed to prohibit discrimination among classes of individuals who should receive equal treatment. The interpretation plaintiff urges would undermine this objective by permitting agents and insurers to discriminate among members of a class through rebating.

With respect to a previous version of the anti-rebating statute, the Kansas Supreme Court has observed that "the manifest purpose of this statute was to break up the practice of granting special favors in a business affected with a public interest in which equality should prevail." *National Savings Life Ins. Co. v. Hobbs*, 129 Kan. 663, 284 Pac. 397, 399 (1930). The courts interpret Kansas statutes in light of "the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effects the statute may have under the various constructions suggested."[2] *State v. Phillips*, 289 Kan. 28, 32, 210 P.3d 93 (2009). The anti-rebating statute, objectively construed, applies where a reasonable insurance consumer would view payment or other consideration as an inducement to the purchase. The statute is not properly subject to an agent or beneficiary's post-payment assertions regarding secret rebates.[3] The statute does not require that the rebate be the *only* reason the insurance is purchased, or that the benefit recipient be

---

[2] Under Kansas law, "statutory interpretation begins with the language selected by the legislature. If that language is clear, if it is unambiguous, then statutory interpretation ends there as well." *Martin v. Kansas Dept. of Rev.*, 285 Kan. 625, 629, 176 P.3d 938 (2008). "The most fundamental rule is that we should ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning." *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 (2007). "[C]ourts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia*." *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975).

[3] Under Kansas law, "[n]o significant deference is due to an agency's interpretation or construction of a statute." *See In re Tax Appeal of Lemons*, 289 Kan. 761, 762, 217 P.3d 41 (2009). The court notes, however, that this construction of the anti-rebating statute is consistent with that of the Kansas Insurance Department, the recently retired Department officer in charge of agent conduct stating by affidavit that

> a producer's payment of a portion of the premium due for insurance is rebating under (K.S.A. 2007 Supp. 40-2404[8]), regardless of whether the insured is aware of the payment. If an insured is unaware that a producer is paying a portion of the premium, he or she necessarily lacks accurate information regarding the price of the insurance. The producer was acting unprofessionally in failing to fully disclose the proper price of the policy involved and his (producer's) payment of a portion of required premium for the insured. Under these circumstances, the producer's payment is "inducement" regardless of the producer's intent in making the payment.

in active, knowing collusion with the rebate. Nor does the statute require that the motive of the agent or insurer be malignant or malicious. It is sufficient if the agent or insurer offered a special benefit or consideration "as inducement" for the policy. That is, the statute applies if the insurer could understand that a rational purchaser would be positively motivated by such a special benefit or consideration.

Here, the payments made by McGuire on the part of Carney were substantial and continuous. A reasonable purchaser of insurance could have considered such payments an inducement for the purchase of the such insurance.

In this context, the Life Compliance Manual is particularly relevant, and it strongly prohibits any payments by agents on behalf of insureds, categorically condemning such payments as illegal rebates. McGuire contends that he never actually viewed this manual language, but it is uncontroverted that the Manual clearly and explicitly contains the prohibitory language, that the Manual was provided in paper form and (beginning in May of 2002) online electronic versions to American Family agents, and that McGuire agreed to be bound by the provisions in the Manual.

The court finds that American Family is entitled to summary judgment on McGuire's breach of contract claim.

Further, the court finds that McGuire's breach of implied covenant of good faith and fair dealing fails for the same reason: the express terms of the contract permit termination when an agent violates state insurance law, in this case by engaging in rebating. The plaintiff's claims of some additional implied covenant cannot displace this express contractual power. *Super Value Stores v. D-Mart Food Stores*, 431 N.W.2d 721, 726 (Wis. App. 1988) (where contracting party exercises a power "specifically authorized in their agreement, we do not see how there can be any breach of the covenant of good faith").

McGuire asswerts that American Family engaged in "incredibly sloppy behavior" and "act[ed] haphazard[ly]." (Dkt. 72, at 42-43). Specifically, he claims it mistakenly failed to rate

Carney accurately for a mid-level discount,[4] and subsequently offered confusing explanations concerning the discount provided to Carney. But the errors McGuire cites do not amount to bad faith, and do not empower the court to remove the contractual provision authorizing termination for unlawful agent conduct. Nor does it permit the court to second-guess the business judgment of the defendant's Vice President concerning plaintiff's termination. *See Strojny v. American Family Mut. Ins.*, No. 07-2883, 2010 WL 744258 (N.D. Ill. Feb. 26, 2010) (dismissing claim of agent accused of rebating, and holding that "[a]ny purported ulterior motives held by American Family do not negate American Family's contractual right to terminate Strojny without notice for engaging in unlawful misconduct").

IT IS ACCORDINGLY ORDERED this 9th day of August that the defendants' Motion for Summary Judgment (Dkt. 63 ) is hereby granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

[4] As noted above, Carney was never entitled to the discounted premium McGuire quoted.